

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-16-00024-CV

---

IN THE INTEREST OF J.C., A.C. AND A.C., CHILDREN

---

On Appeal from the 251st District Court
Randall County, Texas
Trial Court No. 64507-C, Honorable Jack M. Graham, Presiding

---

May 4, 2016

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

A.M. appeals from an order terminating her parental rights to her children, J.C., A.C., and A.C. under Texas Family Code § 161.001(b)(1)(D), (E), and (O). She contends that the evidence was factually insufficient to support termination on those grounds and to support the finding that termination was in the best interests of the children. We affirm.

The pertinent standard of review is discussed in *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) and *In the Interest of J.R.Y.*, No. 07-15-00393-CV, 2016 Tex. App. LEXIS 3221, at *3-4 (Tex. App.—Amarillo March 29, 2016, no pet. h.) (mem. op.) We refer the parties to those cases for its discussion.

Next, to warrant termination of the parent-child relationship, the State must prove both a statutory ground under § 161.001(b)(1) of the Texas Family Code and that termination is in the best interest of the child. *See In re I.G.*, 383 S.W.3d 763, 769 (Tex. App.—Amarillo 2012, no pet.) As previously mentioned, the statutory grounds upon which the trial court based its decision to terminate here were § 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. Only one need have sufficient evidentiary support for the decision to be affirmed. *See In re K.C.B.*, 280 S.W.3d 888, 894-95 (Tex. App.—Amarillo 2009, pet. denied) (stating that only one statutory ground need support termination). And, the first ground upon which we focus is that encompassed in § 161.001(b)(1)(O).

Subsection O permits termination if the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the return of the child who has been in permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]" TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (West Supp. 2015). Furthermore, the "failure to comply" is construed strictly. *In the Interest of D.N.*, 405 S.W.3d 863, 872 (Tex. App.—Amarillo 2013, no pet.); *accord, In re L.G.,* No. 07-14-00365-CV, 2015 Tex. App. LEXIS 3017, at *8 (Tex. App.—Amarillo March 26, 2015, no pet.) (mem. op.) (stating that "[g]enerally, Texas courts take a strict approach when applying § 161.001(b)(1)(O) of the Family Code"). That is, it does not contemplate or permit a certain degree of non-compliance. *Id.* The parent must comply with all of the court ordered provisions to avoid the application of § 161.001(b)(1)(O). Nor does the

2

statute allow for excuses. *In re L.G.,* 2015 Tex. App. LEXIS 3017, at *8. Again, the focus lies upon a parent's failure to comply with the court order; the reasons for non-compliance or the degree of compliance generally are irrelevant. *Id.* A.M. argues here that the evidence was factually insufficient to show that she failed to comply with any of the conditions ordered by the trial court.

According to the record before us, the trial court order establishing the conditions for A.M. securing the return of her children was signed in September of 2014. Various of those provisions required that she be drug-free and submit to drug tests. A.M. admitted to having taken illegal drugs up to December 13, 2014, or about three months after the conditions were imposed on her. Other evidence illustrated that she missed at least two drug tests after being ordered to submit to same. Given this, a reasonable fact finder could have resolved the disputed evidence in favor of determining that she failed to comply with the order in question, and the contrary evidence is not so significant as to prevent a fact finder from forming a firm belief or conviction to that effect. So, the finding regarding § 161.001(b)(1)(O) has factually sufficient evidentiary support.

Next, we consider whether the evidentiary record supports the conclusion that termination was in the best interests of the child. In making this assessment, "we peruse the record with an eye upon what are known as the *Holley* factors." *In re L.G.,* 2015 Tex. App. LEXIS 3017, at *8-9. They include 1) the desires of the child, 2) the present and future physical and emotional needs of the child, 3) the present and future emotional and physical danger to the child, 4) the parental abilities of the persons seeking custody, 5) the programs available to assist those persons seeking custody in

promoting the best interest of the child, 6) the plans for the child by the individuals or agency seeking custody, 7) the stability of the home or proposed placement, 8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and 9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex.1976); *In re L.G.,* 2015 Tex. App. LEXIS 3017, at *9. Additionally, "[e]vidence that proves one or more of the statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest." *In the Interest of T.C.C.H.*, No. 07-11-00179-CV, 2011 Tex. App. LEXIS 10134, at *25 (Tex. App.—Amarillo December 22, 2011, no pet.) (mem. op.) With these considerations in mind, we review the evidence below.

A.M. was in her mid-twenties at the time of trial. Furthermore, the children in question ranged in age (at the time of trial) from two years old to about six and were placed with their grandmother. The two older ones expressed a desire to live with their current caretaker, that is, their grandmother. Both, though, expressed that they enjoyed visits with their mother, and the oldest one wanted them to continue. Before being placed with their grandmother, the children had lived at eight different locations since the Department became involved in August of 2014. This evinced an unstable living environment, according to one witness.

A.M. also admitted to having begun ingesting methamphetamine in February of 2014 and "taking it a few times a week." Apparently, she also consumed Adderall at the same time and favored it.[1] To this we add A.M.'s admissions that 1) one of the children

---

[1] Apparently, Adderall contains a combination of amphetamine and dextroamphetamine. Both stimulate the central nervous system and affect chemicals in the brain and nerves that contribute to hyperactivity and impulse control.

4

had tested positive for drugs, 2) she wanted to commit suicide around December 13, 2014, because her sister did not invite her to a wedding, 3) her brain was "rewire[d]" due to taking methamphetamine, 4) she was also ingesting the anti-depressants "Trazodone" and "Klonopin," 5) she exposed the children to one or more instances of domestic violence between her and another person, and 6) others were giving or loaning her money to pay her expenses such as rent and child support. A.M. also described her inability to retain paid employment since her children were removed; apparently, she had been unemployed for a majority of the time between removal and trial. Another witness described A.M.'s arrest for possessing marijuana and drug paraphernalia in a car, while her children happened to be in the car at the time.

Since their placement with their grandmother, the children have adjusted. Though J.C. was aggressive and disobedient and was experiencing "bathroom accidents" when placed with the grandmother, his behavior has significantly improved. He is also doing well in school. The other two children are doing well and appear to be developing as expected. The children's grandmother also evinced a willingness to adopt the children if A.M.'s parental rights were terminated.

There is also evidence of improvement on the part of A.M., of going to counseling, and of complying with other conditions imposed by the aforementioned court order. So too did she happen to find a job around the time trial began. Other evidence suggests that the children miss their mother and act out after leaving her. Yet, our job is not to substitute our judgment for that of the fact finder. Instead, we look at the evidence it had before it and determine whether that evidence was sufficient to justify its decision. In looking at the record as a whole, we cannot deny that it contained

enough evidence to enable that fact finder to reasonably decide that termination was in the best interests of the child.  Additionally, the contrary evidence is not so significant as to prevent a reasonable person from forming a firm belief or conviction to that end.

Accordingly, we conclude that the trial court's order terminating A.M.'s parental relationship with her children has the support of factually sufficient evidence, overrule her issues, and affirm that order.

Brian Quinn
Chief Justice